IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

ALAN T. BROOKS                              :           CIVIL ACTION
                                            :           NO. 05-4588
           v.                               :
                                            :
DAVID DiGUGLIELMO, JAMES L.                 :
GRACE, MICHAEL LORENZO, A.                  :
SCOTT WILLIAMSON, THOMAS                    :
DOHMAN, RAYMOND A. KNAUER, B.               :
VAN TRIES, JONATHAN TAYLOR,                 :
MICHAEL KISSELL                             :

O'NEILL, J.                                                 December 9 , 2008

MEMORANDUM

On or about April 15, 2005, plaintiff Alan T. Brooks filed a complaint in the Court of Common

Pleas of Montgomery County, Pennsylvania against defendants David DiGuglielmo, superintendent of

the State Correctional Institution - Graterford (Graterford); James L. Grace, superintendent at the State

Correctional Institution - Huntingdon (Huntingdon); Michael Lorenzo, deputy superintendent at

Graterford; A. Scott Williamson, superintendent at Huntingdon; Thomas Dohman, a captain at

Graterford; Raymond A. Knauer, a lieutenant at Graterford; B. Van Tries, a lieutenant at Huntingdon;[1]

Jonathan Taylor, a sergeant at Huntingdon and Michael Kissell, a corrections officer at Huntingdon.

On August 30, 2005, defendants removed to this Court.  After counsel was appointed to represent

him, Brooks filed an amended complaint on October 20, 2006 against the previously named

defendants.  Brooks' amended complaint alleges the following claims under 42 U.S.C. § 1983:

---

[1] Defendants inform me that defendant Van Tries has recently passed away and that Brooks
has been informed.

1

violation of procedural due process rights under the Fourteenth Amendment (Count I);  violation of

substantive due process rights under the Fourteenth Amendment (Count II); violation of the Eighth

Amendment (Count III) and violation of the First Amendment (Count IV) motivated, either in whole or

in part, by a desire to retaliate against plaintiff for commencing a civil rights action in 2000, a mandamus

action in 2004, criminal complaints in 2004 and/or filing of various grievances.  He seeks both injunctive

relief and nominal and punitive damages for his claims.  Presently before me are defendants' motion for

summary judgment, plaintiff's response, defendants' reply and plaintiff's sur-reply.

## BACKGROUND

Plaintiff, a citizen of the United States, is serving a sentence of "life plus 52 years" for

convictions taking place in a Delaware state court.  On March 29, 1994, pursuant to the interstate

Corrections Compact, Brooks was transferred to the custody of the Pennsylvania Department of

Corrections (DOC) to serve the remainder of his sentence because of Brooks' alleged involvement in

an incident and general poor adjustment to incarceration in Delaware.  On July 10, 1996, the DOC

assigned Brooks to Graterford.

On July 19, 2000, Brooks commenced the civil action captioned Brooks v. Horn, et al, CA

No. 00-cv-3637 (E.D. Pa) before this Court (referred to as the "2000 Civil Rights Action") against

certain officers at Graterford based on events arising during his incarceration at Graterford.  Brooks

represented himself pro se.  I granted defendants' motion for summary judgment on April 7, 2004 and

entered judgment in favor of the defendants.

In mid-2003, defendant Thomas Dohman, the intelligence captain for the Graterford Internal

Security Department, heard through a confidential source that Brooks might be involved in distribution

2

of contraband within Graterford and began to monitor plaintiff's phone calls, mail and inmate monetary account.  After several month of monitoring, Dohman believed that Brooks was involved in a drug ring involving other inmates and corrections officers because Brooks was receiving multiple personal gifts from civilians who were not on his visiting list but were on other inmates' lists, signaling to Dohman that the family and friends of other inmates were making payments to Brooks on behalf of that inmate. Dohman also intercepted money orders that citizens connected to other Graterford inmates had attempted to mail directly to Brooks.  Dohman believed Brooks was using a corrections officer to deliver drugs because the FBI, who were investigating a Graterford drug ring, arrested the officer and the officer cooperated with the on-going FBI investigation.

On January 26, 2004, Dohman met with Brooks to discus the illicit activity.  Brooks told Dohman that he was invoking his Fifth Amendment right to remain silent and would not provide him with any information.  He informed Dohman that he did not have time to talk to him because he was working on filing a response in opposition to summary judgment in the 2000 Civil Rights Action, then pending before this Court.  Dohman was not a party to the 2000 Civil Rights Action.  Dohman informed Brooks that he was placing him in the Restricted Housing Unit (RHU) and issued an "Other" report which placed Brooks in administrative custody due to his involvement in an ongoing investigation. Brooks was transferred to the RHU on January 26, 2004.  At the same time, Dohman assigned inmate Nathanial Bishop, who Dohman believed to be engaging in the same illicit activity as Brooks, to the RHU.  When Brooks arrived in the RHU, he did not immediately have the legal materials he needed for his court filing, but he obtained the materials within a few days and was able to file the document without being penalized by the Court for any delay in that filing.

3

On February 13, 2004, defendant Raymond A. Knauer, a lieutenant within the Graterford Internal Security Department and husband of Julie Knauer, one of the defendants in the 2000 Civil Rights Action, released Brooks from the investigation at Dohman's request because Brooks had reached the limit of how many days an inmate may remain under investigation.  Dohman claims that he had sufficient information to issue a misconduct to Brooks which would keep him in the RHU in disciplinary custody.  However, Dohman notes that issuing a misconduct would have required him to include information in the misconduct report that would make it easy for Brooks to determine that a corrections officer was cooperating with the FBI investigation and who that officer was which would pose a threat to the officer's safety and the overall FBI investigation.  Dohman believed that Brooks and Bishop had been "pressuring" the cooperating officer to continue to make deliveries and that keeping Brooks in the RHU would limit his ability to conduct his illicit operations for investigative purposes.  Dohman then instructed Knauer to issue a new report identifying Brooks as "a danger to some person(s) in the institution who could not be protected by alternate means" and Brooks continued in administrative custody in the RHU.  Defendant David DiGuglielmo, superintendent of Graterford, reassigned the report to Lorenzo.  Dohman continued to monitor Brooks' mail and inmate account.  He observed that Brooks' financial transactions slowed considerably and that his mail provided further evidence of his involvement in illicit transactions involving narcotics, oils and/or cigarettes, including a letter which contained what Dohman considered a possible threat by Brooks on another inmate's life.

Inmates in the RHU regularly meet with the Program Review Committee (PRC) which generally consists of three staff members.  On March 10, 2004, Brooks met with a PRC panel consisting of defendant Lorenzo, Michael Spencer, institutional business manager and Francis Feild, major of unit

management.[2]   This panel informed Brooks that they were instructing Dohman to submit paperwork for Brooks' transfer to another institution due to the drug investigation.

Brooks complained about his continued confinement in the RHU and the pending transfer in correspondence to DiGuglielmo.  DiGuglielmo responded that Brooks was being transferred because of his involvement in illicit activity which could jeopardize the safe and orderly operations of the institution and that none of the actions taken were in retaliation for Brooks' litigation.  As previously noted, the 2000 Civil Rights Action was closed on April 7, 2004 when I granted defendants' motion for summary judgment.

On August 25, 2004, Brooks was given a misconduct for possessing contraband because tobacco, which is not permitted in the RHU, was found in the mattress in his cell.  Though Brooks concedes that he had tobacco in his cell and that he did not have a roommate, he asserted that he was holding it for another inmate.

While confined to administrative custody, Brooks filed a Writ of Mandamus on September 1, 2004 (referred to as the "2004 Mandamus Action") alleging that from May of 2004 to September of 2004 he was denied access to standard medical treatment.  Additionally, Brooks filed three private criminal complaints in the Court of Common Pleas of Montgomery County against defendants Knauer, Dohman and Lorenzo (referred to as the "2004 Criminal Complaints") based upon his allegedly protracted solitary confinement within the RHU when he was cleared of any misconduct in the "other" report.

---

[2]  Spencer and Feild are not defendants in this case.

On September 27, 2004, Brooks was transferred to Huntingdon.  Upon arrival, the Huntingdon PRC conducted a review of Brooks' status.  A. Scott Williamson, deputy superintendent of Huntingdon Centralized Services, was part of the PRC panel that decided to maintain Brooks' administrative custody because they needed additional time to review Brooks' files and they needed more information regarding the circumstances of his transfer.

On September 29, 2004, Williamson spoke with Brooks who said that Lorenzo had promised Brooks that he would be placed in general population at Huntingdon.  Three days later, Williamson asked Lorenzo via email whether he had information regarding Brooks' status.  After receiving the email, Lorenzo reviewed the circumstances of Brooks' transfer, but did not pass on any information to Williamson.  Over the next several months, Brooks was regularly reviewed by the PRC and he was informed that the PRC panel was continuing the administrative custody status because additional information necessary to determine Brooks' housing needs was needed.  Meanwhile, the SCI Huntingdon Intelligence Captain, Jon Fisher, contacted Dohman who explained Brooks' involvement in dealing drugs.

On or around October 3, 2004, Brooks alleges that corrections officers took Brooks to inventory his personal property arriving from Graterford.  He alleges that everything was present except his legal materials and his typewriter which he states was required to prosecute the 2004 Mandamus Action and the 2004 Criminal Complaints.  Brooks alleges that Williamson and Grace denied several requests for release from RHU during this time.  Brooks alleges that on November 18, 2004, he was placed on suicide watch for eight days.  Brooks further alleges that he requested permission to make one telephone call per month to his family and access to a television, but Williamson denied this request

6

on December 6, 2004.[3]

On or around December 15, 2004, Brooks received notice that a hearing regarding the 2004 Criminal Complaints was scheduled for December 20, 2004.  The same day, Brooks alleges that Williamson and Grace continued Brooks' time in the RHU for another 90 days.  Though he alleges that he made numerous requests for his legal materials and typewriter to prepare for court, Brooks did not receive his legal materials for court hearings held on December 20, 2004, December 28, 2004 and January 11, 2004.  On or around February 6, 2004, Brooks alleges that defendant Michael Kissell, a corrections officer at Huntingdon, escorted Brooks to his legal materials.  Brooks alleges that he was permitted to take one box of his legal materials to his cell and was required to send some home.

Brooks then filed a grievance alleging that he had still not received his typewriter.  Defendant B. Van Tries, a lieutenant at Huntingdon, was the assigned grievance coordinator and investigated Brooks' grievance.  He found it to be without merit because there was no evidence that Brooks ever owned a typewriter and Grace agreed with Van Tries on appeal.  However, Brooks alleges that his typewriter was subsequently located and returned to him.

On March 9, 2005, the PRC again reviewed Brooks' status and decided to remove him from administrative custody and assigned him to general population.

## STANDARD OF REVIEW

Rule 56(c) of the Federal Rules of Civil Procedure provides, in relevant part, that summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits

---

[3]  Brooks' amended complaint suggests that this request was denied on December 6, 2006, but I assume that this was a typo.

show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as

a matter of law."  Fed. R. Civ. P. 56(c).  An issue of material fact is genuine if "the evidence is such that

a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc.,

477 U.S. 242, 255 (1986).  Summary judgment will be granted "against a party who fails to make a

showing sufficient to establish the existence of an element essential to that party's case, and on which

that party will bear the burden of proof at trial."  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

The party moving for summary judgment has the burden of demonstrating that there are no

genuine issues of material fact.  Id. at 322-23.  If the moving party sustains the burden, the nonmoving

party must set forth facts demonstrating the existence of a genuine issue for trial.  See Anderson, 477

U.S. at 255.  Rule 56(e) provides that when a properly supported motion for summary judgment is

made, "an adverse party may not rest upon the mere allegations or denials of the adverse party's

pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set

forth specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e).  The adverse

party therefore must raise "more than a mere scintilla of evidence in its favor" in order to overcome a

summary judgment motion, and cannot survive by relying on unsupported assertions, conclusory

allegations, or mere suspicions.  Williams v. Borough of W. Chester, 891 F.2d 458, 460 (3d Cir.

1989).  However, the "existence of disputed issues of material fact should be ascertained by resolving

'all inferences, doubts and issues of credibility against'" the moving party.  Ely v. Hall's Motor Transit

Co., 590 F.2d 62, 66 (3d Cir. 1978), quoting Smith v. Pittsburgh Gage & Supply Co., 464 F.2d 870,

878 (3d Cir. 1972).

8

DISCUSSION

Section 1983 provides an avenue for individuals to adjudicate violations of rights secured under federal constitutional or statutory law.  Elmore v. Cleary, 399 F.3d 279, 281 (3d Cir. 2005).  A valid claim under § 1983 must plead adequately three elements:  (1) defendants acted under color of law; (2) defendants violated plaintiffs' federal constitutional or statutory rights and (3) that violation caused injury to plaintiffs.  Id.  While it is undisputed that defendants were acting under color of law, in the present motion defendants argue that they are entitled to summary judgment on all four counts of Brooks' amended complaint because none of the alleged constitutional violation satisfy the second element of § 1983 and that defendants are protected by qualified immunity.

When a state official's actions give rise to a § 1983 claim, the privilege of qualified immunity, in certain circumstances, can serve as a shield from suit.  Wright v. City of Philadelphia, 409 F.3d 595, 599 (3d Cir. 2005), citing Hunter v. Bryant, 502 U.S. 224, 227 (1991).  Qualified immunity is "an entitlement not to stand trial or face the other burdens of litigation."  Mitchell v. Forsyth, 472 U.S. 511, 526 (1985).  Since qualified immunity is "an immunity from suit, rather than a mere defense to liability, it is imperative to resolv[e] immunity questions at the earliest possible stage in litigation."  Saucier v. Katz, 533 U.S. 194, 200-01 (2001) (citations and emphasis omitted).

The threshold question of the qualified immunity analysis is:  "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the [state actor's] conduct violated a constitutional right?"  Id. at 201.  If no constitutional violation is shown the inquiry need not progress and the state actors are entitled to judgment; however, if the facts alleged demonstrate a constitutional violation, the Court must proceed to ask whether the constitutional right was clearly established at the

9

time in light of the specific context of the case at bar.  Id.[4]  This two-step inquiry reflects the rationale

behind the doctrine of qualified immunity:  "The general rule of qualified immunity is intended to provide

government officials with the ability reasonably to anticipate when their conduct may give rise to liability

for damages.  Where that rule is applicable, officials can know that they will not be held personally

liable as long as their actions are reasonable in light of current American law."  Anderson v. Creighton,

483 U.S. 635, 646 (1987) (quotation marks and citation omitted).

I will discuss each count in turn, first to determine whether plaintiff has sufficiently pled a

constitutional claim and then, if so, whether defendants are protected by qualified immunity from

liability.

I.      Procedural Due Process Rights under the Fourteenth Amendment Violation

Brooks claims that defendants denied him his right to procedural due process in thirteen  ways,

which I will address individually, though most of the violations are conditions accompanying his

assignment to the RHU in administrative custody.  Defendants argue that none of the events are a due

process violation and that no reasonable jury could find that the defendants denied Brooks due process

in violation of the Fourteenth Amendment.

Procedural due process generally guarantees that the state will not deprive someone of a

protected interest in life, liberty or property without due process of law.  U.S. Const. Am. XIV; Parratt

_____

[4]  Though the Supreme Court has expressed concerns with continuing to analyze constitutional
questions before those of immunity to suit in Scott v. Harris, 127 S.Ct. 1769, 1774 n.4 (2007), Saucier
has not been specifically overruled and so continues to govern.  Ruiz v. Lebanon County, Pa., 2007
WL 2907813, at *5 (M.D. Pa. Oct. 3, 2007)

v. Taylor, 451 U.S. 527, 537 (1981), overruled on other grounds Daniels v. Williams, 474 U.S. 327

(1986).  In other words, there can be no deprivation of due process in the absence of a protected

interest.  In prison litigation, the Supreme Court held that "federal courts ought to afford appropriate

deference and flexibility to state officials trying to manage a volatile environment."  Sandin v. Conner,

515 U.S. 472, 482 (1995).  Further, the Court held that while mandatory language may create interests

that are protected by the Due Process Clause,

> these interests will generally be limited to freedom from restraint which, while not
> exceeding the sentence in such an unexpected manner as to give rise to protection by
> the Due Process Clause of its own force, . . . nonetheless imposes atypical and
> significant hardship on the inmate in relation to the ordinary incidents of prison life.

Id. at 484.  (internal citations omitted).

First, Brooks alleges that defendants denied him his right to procedural due process by

confining him to solitary confinement in the RHU for 409 days without finding him guilty of any

misconduct.  However, the Court of Appeals has held that temporary assignment to the DOC's RHU

does not impose an atypical and significant hardship on the inmate under Sandin and thus does not give

rise to a possible due process violation.  Griffin v. Vaughn, 112 F.3d 703, 708 (3d Cir. 1997), holding

that a placing an inmate-plaintiff in administrative custody for 15 months without charging him for a

misconduct was not an atypical and significant hardship.   Here, Brooks was in RHU custody for fewer

than 15 months in conditions nearly identical to those described in Griffin.  Thus, his stay in the RHU,

even if he was not charged with a misconduct, did not implicate his protected liberty interests.

Second, Brooks alleges that defendants denied him his right to procedural due process by

confiscating Brooks' personal property while he was confined to solitary confinement in the RHU.  In

Griffin, the Court of Appeals noted that RHU inmates may not keep personal property, other than certain legal materials, in their cell and found that denial of personal property apart from legal materials did not implicate liberty interests.  Griffin, 112 F.3d 706.  This did not implicate protected property interests.  However, even if this had implicated property interests, the Supreme Court has held that meaningful post-deprivation remedies provide sufficient due process for negligent deprivations of property, Parratt v. Taylor, 451 U.S. 527, 530 (1981),[5] and intentional deprivations of property, Hudson v. Palmer, 468 U.S. 517, 533 (1984), and that requiring a pre-deprivation hearing would be absurd since it would be impossible to determine when a negligent or intentional deprivation of property would occur.  Zinermon v. Burch, 494 U.S. 113, 137 (1990).  The Court of Appeals has held that the DOC's grievance procedure provides an adequate post-deprivation remedy, see, e.g., Tillman v. Lebanon County Corr. Fac., 221 F.3d 410, 422 (3d Cir. 2000), and that the existence of this post-deprivation remedy forecloses any due process claim, Austin v. Lehman, 893 F. Supp. 448, 454 (E.D. Pa. 1995) even if an inmate is dissatisfied with the result of the process.  Iseley v. Horn, 1996 WL 510090, at *6 (E.D. Pa. Sept. 3, 1996).  As Brooks admits to having used the grievance procedure to attempt the return of his typewriter, he had access to an adequate post-deprivation remedy and even if there had been a violation of his liberty interest he was not denied the right to due process of law.

Third, Brooks alleges that defendants denied him his right to procedural due process by keeping him from his legal materials and typewriter on various occasions including when defendants had actual knowledge that these materials were needed for court filings and appearances.  As noted above,

---

[5]  Daniels v. Williams, 474 U.S. 327 (1986) subsequently confined the holding in Parratt to deprivations involving something more than mere negligence.

Brooks had no right to general property.  However, as the <u>Griffin</u> Court noted, inmates in the RHU are

permitted legal materials contained in one records center box.  <u>Griffin</u>, 112 F.3d at 707.  Though

Brooks has also brought an access to courts claim under the First Amendment, I will address an access

to the courts claim under the Fourteenth Amendment as well.  <u>See</u> <u>Bounds v. Smith</u>, 430 U.S. 817

(1977).  The Court of Appeals has held that confiscation of legal materials may constitute a violation of

the right to access the courts.  <u>Zilich v. Lucht</u>, 981 F.2d 694, 696 (3d Cir. 1992).  In <u>Christopher v.

Harbury</u>, 563 U.S. 403 (2002), the Supreme Court held that an inmate must establish that there was an

actual injury to a nonfrivolous or arguable claim to make a claim for access to courts violation,

regardless of whether there is an ongoing obstruction to a prospective claim or, because of a past

obstruction, the claim can no longer be brought.  <u>Id.</u> at 415.  Here, there is no evidence that Brooks

was injured through keeping him from his legal materials and his typewriter.  Though he was separated

from his legal materials while litigating the 2004 Civil Rights Action, he was able to timely file a motion

for extension of time and he was not injured.  Brooks argues that he only had one hour per day to

devote to legal research because of the limited access to the law library while in administrative custody

combined with this brief separation from his legal materials precluded him from sufficiently researching

and preparing his response to the 2000 Civil Rights Action.  However, Brooks filed his response to the

motion for summary judgment on March 1, 2004, two weeks before the due date of March 15, 2004.[6]

He had additional time for research and writing available and he chose not to take advantage of it.  As

---

[6] On December 17, 2003, I granted Brooks' motion for an extension of time to file a response to defendants' motion to dismiss until February 2, 2004.  On February 5, 2004, I granted another motion for extension of time to file a response.

he has been unable to show that there was an actual injury, Brooks has not stated a claim for access to the courts and was not denied due process of law.

Fourth, Brooks alleges that defendants denied him his right to procedural due process by preventing him from continuing his college education.  However, an inmate has no liberty or property interest in education programs offered in prison.  Coffey v. Ingram, 1988 WL 82855, at * 1 (E.D. Pa. Aug. 4, 1988), citing Hayes v. Cuyler, 475 F. Supp. 1347, 1350 (E.D. Pa. 1979).  As Brooks has no liberty or property interest in education programs offered in prison, he was not deprived of due process.

Fifth, Brooks alleges that defendants denied him his right to procedural due process by preventing him from working.  To have a property interest, a person must have more than an abstract need or desire for it and more than a unilateral expectation of it; he must have a legitimate entitlement to it.  Getz v. Carroll, 2001 WL 1617189, at *2 (D. Del. Dec. 3, 2001), citing Board of Regents v. Roth, 408 U.S. 564, 577 (1972).  However, under Pennsylvania law, "[i]t is uniformly well established throughout the federal circuits that an inmate's expectation of keeping a specific prison job, or any job, does not implicate a property interest under the fourteenth amendment."  Cummings v. Banner, 1991 WL 238140, at *5 (E.D. Pa. Nov. 6, 1991), citing James v. Quinlan, 866 F.2d 627, 630 (3d Cir. 1989).  Additionally, as Brooks concedes, under current Delaware law a prisoner's work assignment is not a protected interest; "[p]risoners have no entitlement to a specific job, or even to any job."  Shockley v. Hosterman, 2007 WL 1810480, at *3  (D. Del. June 22, 2007) citing James v. Quinlan, 866 F.2d at 630.  A property or liberty interest must be created, if at all, by statutes or regulations containing "the repeated use of explicitly mandatory language."  Getz, 2001 WL 1617189, at *2, citing

14

Hewitt v. Helms, 459 U.S. 460, 472 (1983).

The relevant Delaware statute states that "[t]he Department may establish compulsory programs of employment, work experience and training for all physically able inmates."  11 Del. C. § 6532 (2008).  The current statutory scheme does not create a protectable liberty interest, Getz, 2001 WL 1617189, at *2, but Brooks argues that the Delaware statute in effect at the time of Brooks' initial incarceration in 1987 created a statutory liberty interest by providing that "[t]he Department shall provide opportunities for employment, work experiences and training for all inmates" 11 Del. C. § 6532 (1987) and that to apply the more recent version of the Delaware statute to Brooks would be illegal as an ex post facto law.

The Supreme Court has described an illegal ex post facto law as one "which imposes a punishment for an act which was not punishable at the time it was committed; or imposes additional punishment to that then prescribed." Weaver v. Graham, 450 U.S. 24, 28 (1981), quoting Cummings v. Missouri, 71 U.S. 277 (1866)).  Further, the ex post facto clause only applies to laws that are penal in nature.  Collins v. Youngblood, 497 U.S. 37, 41 (1990).  Here, the enactment of the new policy is not punitive and Brooks has provided no authority for holding that this is an illegal ex post facto law. Courts give broad deference to prison administrators' policies that are "reasonably related to legitimate penological interests." Fidtler v. Pa Dept. of Corrections, 55 Fed. Appx. 33, 35 (3d Cir. 2002), quoting Turner v. Safley, 482 U.S. 78, 89  (1987).  As the policy does not fall within the ambit of an illegal ex post facto law and neither Pennsylvania nor Delaware law creates a liberty or property interest in having a prison job, defendants did not deprive Brooks of due process.

Sixth, Brooks alleges that defendants denied him his right to procedural due process by

15

denying him basic telephonic privileges.  However, as the <u>Griffin</u> Court noted, inmates in the RHU are

not permitted telephone calls except for emergencies or legal issues and this circumstance did not

constitution a violation of due process of law.  <u>Griffin</u>, 112 F.3d at 706.  Despite this regulation, Brooks

admitted in his deposition that he was able to make phone calls at least once a week while in the RHU.

Thus, this claim has no basis in fact.

Seventh, Brooks alleges that defendants denied him his right to procedural due process by

denying him basic family visiting privileges.  As the <u>Griffin</u> Court noted, inmates in the RHU are

permitted a limited number of visitors and this restriction does not implicate liberty interests.  <u>Griffin</u>,

112 F.3d at 706.  As Brooks did not have a liberty interest, defendants did not deprive Brooks of due

process.

Eighth, Brooks alleges that defendants denied him his right to procedural due process by

preventing Brooks from effectively prosecuting the 2000 Civil Rights Action, the 2004 Mandamus

Action and the 2004 Criminal Complaints.  I addressed these claims in my analysis of the deprivation of

his legal materials and his typewriter.  As he was not denied access to the court, defendants did not

deprive him of due process of law.

Ninth, Brooks alleges that defendants denied him his right to procedural due process by causing

Brooks not to receive "good time" credits while held in administrative custody because his assignment

to the RHU caused him to lose his job and thus his ability to earn "good time" credits.  Defendants note

that Brooks is serving a Delaware state sentence and is therefore able to earn "good time" credits

which are used to decrease an inmate's parole eligibility date.  Brooks alleges that he is eligible for merit

"good time" credits which may be awarded for working.  <u>Snyder v. Andrews</u>, 708 A.2d 237, 243

(Del. 1998).  As previously noted, prisoners have no right to a job under either Pennsylvania or

Delaware law.  See Cummings, 1991 WL 238140, at *5; Shockley, 2007 WL 1810480, at *3.

Similarly, the Due Process Clause does not guarantee the right to earn "good time" credits.  Shockley,

2007 WL 1810480, at *3, citing Abdul-Akbar v. Department of Corr., 910 F. Supp. 986, 1003 (D.

Del.1995).  As he does not have a liberty or property interest in the earning of "good time" credits,

defendants did not deprive Brooks of due process of law.

Tenth, Brooks alleges that defendants denied him his right to procedural due process by treating

Brooks in the same manner as those inmates found guilty of misconduct and serving punishment in the

RHU, alleging specifically that he received visual rectum examinations upon visiting the law library and

the recreation yard.  A visual rectal exam is part of a standard strip search which was found not to

implicate protectable liberty interests because it does not impose an atypical and significant hardship in

relation to the ordinary incidents of prison life.  Brothers v. Lawrence County Prison Bd., 2008 WL

146828, at *11 (W.D. Pa. Jan. 14, 2008).  As he does not have a liberty or property interest in

avoiding strip searches and does not allege other examples for this claim, defendants did not deprive

Brooks of due process of law.

Eleventh, Brooks alleges that defendants denied him his right to procedural due process by

denying him access to standard medical care.  As defendants note, it is not clear what medical care of

which Brooks was deprived.  He states in his complaint that his stay in the RHU removed him from a

Hepatitis C treatment program to which he had previously been accepted, but he does not seem to

state what standard medical care was denied to him.  However, even if proven, inmate allegations of

sub-standard medical care do not implicate constitutionally protected liberty interests and should be

17

brought as violations of the Eighth Amendment as Brooks has done.  Cooleen v. Lamanna, 248 Fed.

Appx. 357, 361 (3d. Cir. 2007).  As Brooks does not have a liberty or property interest under the

Fourteenth Amendment for this claim, defendants did not deprive him of due process of law.

Twelfth, Brooks alleges that defendants denied him his right to procedural due process by

delaying the transfer of his record from Graterford and/or the review of this transferred records at

Huntingdon which caused Brooks to remain within the RHU.  As previously explained, Brooks' alleged

injury of having been assigned time in the RHU did not independently implicate a liberty interest.

Additionally, he does not provide any support for the proposition that an inmate has an independent

liberty or property interest in having records arrive simultaneously with his arrival at a new facility.  The

records arrived a short time thereafter and Brooks does not allege an injury to his property interest by

having his records arrive later.  As he does not have a liberty or property interest, defendants did not

deprive Brooks of due process of law.

Thirteenth, Brooks alleges that defendants denied him his right to procedural due process

by causing him to lose his eligibility for earlier parole.  As this appears to be linked to loss of the ability to

earn "good time" credits during his stay in the RHU, I will again find that defendants did not deprive

Brooks of due process of law.

Brooks has not established that any of the actions of defendants he contends violated his right to

procedural due process presented the type of atypical, significant deprivation in which a State might

conceivably create a liberty interest.  Sandin, 515 U.S. at 486.  Because Brooks has failed to show that

his constitutional right to procedural due process  under the Fourteenth Amendments were violated by

defendants' actions, the issue of qualified immunity need not be addressed for those claims.  Muhammad

v. Hilbert, 906 F. Supp. 267, 272 (E.D. Pa. 1995), citing Siegert v. Gilley, 500 U.S. 226, 232 (1991),

holding that if the plaintiff has failed to demonstrate a violation of a clearly established constitutional right,

the defendant does not bear burden of proving a qualified immunity defense. I will therefore grant

defendants' motion for summary judgment on this claim.

II.     Substantive Due Process Rights under the Fourteenth Amendment Violation

   Brooks argues that defendants denied Brooks his right to substantive due process through

several actions which I will detail below.  Defendants properly note and Brooks does not contest that

substantive due process claims cannot be raised where those claims could be brought under other

constitutional amendments or provisions that provide the specific legal tests and standards for addressing

those claims.  Albright v. Oliver, 510 U.S. 266, 273 (1994).  Where a particular constitutional

amendment provides an explicit textual source of constitutional protection against a particular sort of

government behavior, that amendment rather than the more generalized notion of substantive due

process must be the guide for analyzing these claims.  Id.

   First, Brooks argues that defendants denied Brooks his right to substantive due process by

confining Brooks to solitary confinement in the RHU for 409 days without finding Brooks guilty of

misconduct.  This claim is properly evaluated under the procedural due process clause. Second, Brooks

argues that defendants denied Brooks his right to substantive due process by keeping Brooks from his

legal materials and typewriters on various occasions including at times when defendants had actual

knowledge that such legal materials were needed for court filings and appearances.  However, access to

court claims are properly brought under the procedural due process clause or the First Amendment.

Third, Brooks argues that defendants denied Brooks his right to substantive due process by denying

Brooks access to standard medical care, causing him to suffer actual damages.  As previously noted, inmate claims of improper or inadequate medical treatment are assessed under the Eighth Amendment deliberate indifference standard.  Because Brooks has failed to show that his constitutional right to substantive due process under the Fourteenth Amendment was violated by defendants' actions, the issue of qualified immunity need not be addressed for those claims.  Muhammad, 906 F. Supp. at 272, citing Siegert, 500 U.S. at 232 (1991).  Therefore, I will grant defendants' motion for summary judgment on this claim.

III.   Eighth Amendment Rights Violation

Brooks alleges that defendants violated his Eighth Amendment right to be free from cruel and unusual punishment by confining Brooks to solitary confinement in the RHU for 409 days without finding him guilty of any misconduct and denying him access to standard medical care.  Defendants argue that his claims are baseless because the Court of Appeals has previously held that these actions do not violate the Eighth Amendment.

"The Constitution does not mandate comfortable prisons, but neither does it permit inhumane ones, and it is now settled that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment."  Farmer v. Brennan, 511 U.S. 825, 832 (1994), citations and quotation marks omitted.  "The Cruel and Unusual Punishments Clause, and indeed the entire Eighth Amendment, is made applicable to the states through the Fourteenth Amendment."  Hubbard v. Taylor, 399 F.3d 150, 164 n.21 (3d Cir. 2005), citing Robinson v. California, 370 U.S. 660 (1962).  The Eighth Amendment requires that prison officials provide "humane conditions of confinement," including adequate food, clothing, shelter, and medical care.  Farmer v.

Brennan, 511 U.S. 825, 832 (1994), citations omitted.  A prison official violates the Eighth Amendment only when two requirements are met:  first, the deprivation alleged must be objectively "sufficiently serious" – that is, the official's act or omission must result in the denial of "the minimal civilized measure of life's necessities" and second, the official must exhibit a "deliberate indifference" to inmate health and safety.  Id. at 834 (internal citations omitted).  Essentially,

> a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

Id. at 838.

Brooks claims that defendants violated his Eighth Amendment rights by confining him to solitary confinement in the RHU for 409 days without finding him guilty of any misconduct.  The Court of Appeals found in Griffin that the conditions of administrative custody clearly do not involve a deprivation of any basic human need under the Eighth Amendment.  112 F.3d at 709.  Thus, this claim does not implicate a liberty interest.

Additionally, Brooks claims that defendants violated his Eighth Amendment rights by denying him access to standard medical care.  He does not explain in what way this was done, but the Supreme Court has found that an inadvertent failure to provide medical care or a negligent diagnosis does not reach the deliberate indifference standard.  Wilson v. Seiter, 501 U.S. 294, 297 (1991).  An inmate's disagreement with a course of treatment taken by a physician does not constitute deliberate indifference, White v. Napoleon, 897 F.2d 103, 110 (3d Cir. 1990), and prison officials who are not physicians cannot be found deliberately indifferent for failing to respond to an inmate's complaints about a medical

condition when the inmate is already being treated by a physician.  <u>Durmer v. O'Carroll</u>, 991 F.3d 64,

69 (3d Cir. 1993).  To the extent that Brooks received medical care but disagreed with the treatment

provided because he would have preferred to remain in the new Hepatitis C treatment program to which

he had been accepted, his claim is insufficient to impose liability upon the defendants who are not

physicians.  If he is alleging that he received no medical care while in RHU, there is no evidence that this

is the case or that the defendants were aware of his need for medical care.  Because Brooks has failed

to show that his constitutional rights under the Eighth Amendment were violated by defendants' actions,

the issue of qualified immunity need not be addressed for those claims.  <u>Muhammad</u>, 906 F. Supp. at

272, <u>citing</u> <u>Siegert</u>, 500 U.S. at 232 (1991).  I will therefore grant defendants' motion for summary

judgment on this claim.

IV.   <u>First Amendment Rights Violation</u>

Brooks claims that defendants retaliated against him for exercising his First Amendment right to

file a grievance by the same thirteen actions as alleged for procedural due process.  These actions can be

described as the assignment to the RHU for 409 days and the attendant restrictions.  Defendants argue

that their actions were not in retaliation for his filing of lawsuits and grievances against prison officials

because they were unaware of the litigation and that they would have taken the same actions for

legitimate penological reasons had the grievances and lawsuits never been filed.

Accompanying an inmate's First Amendment right to adequate, effective, and meaningful court

access is the requirement that such access be "freely exercisable without . . . fear of retaliation."

<u>Milhouse v. Carlson</u>, 652 F.2d 371, 374 (3d Cir. 1981).  A "prisoner litigating a retaliation claim need

not prove that he had an independent liberty interest in the privileges he was denied."  <u>Rauser v. Horn</u>,

22

241 F.3d 330, 333 (3d Cir. 2001).  As a threshold matter, to establish retaliation an inmate must

establish that:  (1) he engaged in constitutionally protected activities; (2) he suffered an "adverse action"

at the hands of prison officials and (3) there is a causal link between the exercise of his constitutional

right and the adverse action taken against him.  Wolfe v. Pennsylvania Dep't of Corrections, 334 F.

Supp.2d 762, 773-74 (E.D. Pa. 2004), citing Rauser v. Horn, 241 F.3d 330, 333-34 (3d Cir. 2001).

Brooks has fulfilled the first prong as filing a lawsuit and submitting grievances are constitutionally

protected activities, Inmates of the Pennsylvania Dept. of Corrections v. Corbett, 484 F. Supp.2d 359,

373 (E.D. Pa. 2007).  As to the second prong, for the purposes of a retaliation claim, an action is

adverse if it is "sufficient to deter a person of ordinary firmness from exercising his constitutional rights."

Rauser, 241 F.3d at 333.  Though placement in the RHU did not deter Brooks from filing additional

lawsuits and grievances, being placed in the RHU constitutes an adverse action under this objective

standard.  Brooks has presented sufficient evidence of adverse actions to allow a reasonable jury to

conclude that a person of ordinary firmness would be deterred from exercising his constitutional rights.

Ebersole v. Pennsylvania, 2007 WL 2815730, at *6 (M.D. Pa. Sept. 25, 2007).  Defendants concede

that Brooks has fulfilled the first two prongs of the Rauser test.

However, defendants argue that Brooks cannot establish causation.  The third prong employs a

burden-shifting framework.  The prisoner bears the initial burden of proving that his constitutionally

protected conduct was a substantial motivating factor in the decision to retaliate against him.  Rauser,

241 F.3d at 333.  A plaintiff must come forward with more than "general attacks" upon the defendants'

motivations and must produce "affirmative evidence" of retaliation from which a jury could find that the

plaintiff had carried his burden of proving the requisite motive.  Ebersole, 2007 WL 2815730, at *6,

citing Crawford-El v. Britton, 523 U.S. 574, 600 (1998).  Once the prisoner meets this burden, the

burden then shifts to the defendant to prove by a preponderance of the evidence that he would have

taken the same action even in the absence of the protected activity.  Rauser, 241 F.3d at 334.  Even if a

prisoner can demonstrate that the exercise of his constitutional rights was a substantial or motivating

factor in the decision to discipline him, so long as a prison official can prove that absent the protected

conduct he would have made the same decision for reasons reasonably related to a legitimate

penological interest he will prevail on a claim of retaliation.  Id., citing Turner v. Safley, 482 U.S. 78, 89

(1987).

Brooks offers no more than conclusory statements and general attacks upon defendants'

motivations to prove his claim.  He produces no "affirmative evidence" of retaliation by any of the

defendants that his constitutionally protected conduct was a substantial motivating factor in the decision

to retaliate against him other than "suggestive temporal proximity".  Rauser, 241 F.3d at 333.  While

evidence of suggestive temporal proximity is relevant, id. at 334, here the temporal proximity is not

sufficiently suggestive to prove a claim.  The decision to place Brooks in the RHU pending an

investigation did indeed take place after Brooks informed Dohman for the first time that he was involved

in pending litigation against the prison, but Brooks presents no evidence showing that he was not to be

placed in the RHU regardless of his litigation.  Nor does Brooks present evidence that subsequent

decisions to keep him the RHU were based upon retaliation for later litigation other than the fact that the

time periods upon which his placement within the RHU had to be reexamined sometimes coincided with

the timing in his litigation of the 2004 Writ of Mandamus or the 2004 Criminal Complaints.  This

temporal proximity is merely coincidence and does not suggest retaliatory action.

However, even if he had been able to show affirmative evidence of suggestive temporal proximity, defendants argue that they were each unaware of Brooks' pending litigation when taking the actions that Brooks claims are retaliatory.  Defendants Dohman, Knauer, DiGuglielmo and Lorenzo claim that they were unaware of the lawsuit pending against the prison, even if they themselves or their wives were named in it because inmate suits are extremely common and it would be impossible to know of all of them pending at any time.  There is also no evidence in the record that any defendants knowingly interfered with Brooks' medical care as he claims or that they were aware that he was earning "good time" credits under the Delaware system, as they do not exist in Pennsylvania, and thus could not know that transfer to the RHU would stop him from earning them.  Likewise, there is no evidence that Williamson and Grace were aware of the 2000 Civil Rights Action against Graterford and Graterford employees and so would not have kept him in administrative custody upon his transfer to Huntington in retaliation for the litigation.  There is also no evidence that Kissel, Van Tries or Taylor based their decision on the grievance regarding the location of Brooks' typewriter on his record of past litigation or grievances as there is no evidence that they were aware of these previous activities.  Brooks has thus been unable to show the element of causation under the Rauser test.

Additionally, even if a genuine issue of material fact about defendants' motivation for causation had been shown, defendants have shown that they would have taken the same actions in the absence of the protected activity.  The undisputed facts provide sufficient evidence of legitimate penological reasons for placing Brooks under administrative custody apart from retaliatory reasons.  Indeed, the undisputed facts indicate that inmate Bishop was treated in exactly the same manner under the same investigation without any pending litigation against the prison or its employees.  Dohman's belief that Brooks was

25

involved in the Graterford drug ring and was protecting the corrections officer participating in the FBI

investigation into the drug ring are legitimate penological interests, though Brooks claims that he did not

have any relationship with the correction officer nor the drug ring.  The restrictions to which Brooks was

subject and his inability to earn "good time" credits and reduce the time required for parole were a

byproduct of his assignment to RHU administrative custody and are reasonable.  Additionally,

Williamson noted in his deposition that it is typical to continue a new inmate's RHU administrative

custody status upon transfer until the prison receives the inmate's history.  The undisputed facts establish

that efforts were made to obtain additional information and that after the required information was

obtained, Brooks was released to the general population.  As to Brooks' contention that the failure to

return his typewriter after his transfer was a retaliatory act, the record establishes that the typewriter was

misplaced and was returned as soon as it was located.  There is no evidence that this procedure should

have been conducted differently.

Brooks cannot show that retaliation was a substantially motivating factor in the defendants'

actions and, even if it was, defendants demonstrated that they would have acted in the same way

regardless of the filing of grievances and lawsuits against prison officials.  Because Brooks has failed to

show that his constitutional rights under the First Amendment were violated by defendants' actions, the

issue of qualified immunity need not be addressed for those claims.  Muhammad, 906 F. Supp. at 272,

citing Siegert, 500 U.S. at 232 (1991).  I will therefore grant defendants' motion to dismiss on this

ground

V.     Eighth Amendment Retaliation Claim

In his response to defendants' motion for summary judgment, Brooks brings a claim for

retaliation under the Eighth Amendment for his alleged decision not to participate in an internal sting

operation.  Defendants correctly note that Brooks did not bring this claim in his original complaint and so

cannot bring it at this stage without amending his complaint.  However, even if he were to amend his

complaint, Brooks' claim would be dismissed on qualified immunity.

Claims for retaliation under the Eighth Amendment must survive the same test as those under the

First Amendment.  To state an actionable claim for retaliation, a prisoner-plaintiff must prove that:  (1)

the conduct which led to the alleged retaliation was constitutionally protected; (2) he suffered some

adverse action that was sufficient to deter a person of ordinary firmness from exercising his constitutional

rights and (3) the constitutionally protected conduct was a substantial or motivating factor in the decision

to take adverse action.  Rauser, 241 F.3d at 333.

Brooks relies almost entirely on Cooper v. Beard, 2006 WL 3208783 (E.D. Pa. Nov. 2, 2006)

to establish a constitutional right not to participate in a sting operation.  Assuming that this is a protected

right as was found in Cooper, id. At *15, and that placement in administrative custody continues to

constitute an administrative action, Brooks must then prove that the constitutionally protected conduct

was a substantial or motivating factor in the decision to take adverse action.  For purposes of

establishing causation, evidence of "suggestive temporal proximity" is relevant.  Id. at *13, citing Rauser,

241 F.3d at 334.  Under the standard suggested by Cooper, though Brooks is represented by counsel

and thus mere mention of the word "retaliation" is not sufficient to imply a causal link as would be

appropriate if he were representing himself pro se, Michell v. Horn, 318 F.3d 523, 530 (3d Cir. 2003),

Brooks would have sufficiently stated a claim under the Rauser test.  However, at this point, defendants

would be permitted to show that they would have taken the same actions even if Brooks had not

27

engaged in the protected actions.  Under the First Amendment retaliation claim, defendants

demonstrated that they would have acted in the same way regardless of whether Brooks engaged in the

protected action of filing the 2000 Civil Rights Action.  As the Eighth Amendment retaliation claim was

not brought in the original complaint, defendants have not fully briefed this issue on the merits.  However,

they note that the defendants' actions would be protected by qualified immunity even if the complaint

were amended to include this claim and defendants were unable to show that they would have acted in

the same manner without the failure to serve as a "snitch."

As previously noted, qualified immunity can serve as a shield from suit.  <u>Wright</u>, 409 F.3d at

599, citations omitted.  "The general rule of qualified immunity is intended to provide government

officials with the ability reasonably to anticipate when their conduct may give rise to liability for damages.

Where that rule is applicable, officials can know that they will not be held personally liable as long as

their actions are reasonable in light of current American law."  <u>Anderson v. Creighton</u>, 483 U.S. 635,

646 (1987) (quotation marks and citation omitted).

Here, as was noted by the <u>Cooper</u> Court,

it cannot be said that the right not to participate in an internal sting operation was clearly
established at the time of defendants' alleged actions.  Although a logical outgrowth of cases
acknowledging the dangers of being labeled a prison informant, the paucity of cases addressing
the constitutionality of requiring an inmate to participate in a sting operation evidences the fact
that such a right cannot be said to have been clearly established at the time of defendants'
actions.

<u>Cooper</u>, 2006 WL 3208783, at *15.  <u>Cooper</u> cannot be said to put defendants on notice of such a right

not to participate in a sting operation because it was not issued until November 6, 2006.  Brooks alleges

that he declined Dohman's request to be an informant on January 26, 2004 and all other events at issue

in this matter are alleged to have taken place well before November 6, 2006.  As the constitutional right was not clearly established at the time a cause of action would have accrued, defendants would be protected from any Eighth Amendment retaliation claim for refusing to participate in a sting operation by qualified immunity, even if the complaint were amended to include this claim.

An appropriate Order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

ALAN T. BROOKS                    :         CIVIL ACTION
                                  :         NO. 05-4588
        v.                        :
                                  :
DAVID DiGUGLIELMO, JAMES L.:
GRACE, MICHAEL LORENZO, A. :
SCOTT WILLIAMSON, THOMAS    :
DOHMAN, RAYMOND A. KNAUER, B. :
VAN TRIES, JONATHAN TAYLOR,  :
MICHAEL KISSELL              :

ORDER

        AND NOW, this    9th     day of December 2008, upon consideration of defendants' motion

for summary judgment, plaintiff's response, defendants' reply and plaintiff's sur-reply, it is ORDERED

that defendants' motion for summary judgment is GRANTED and judgment is entered against plaintiff

and in favor of defendants with respect to all counts of plaintiff's second amended complaint.


                                    /s/ THOMAS N. O'NEILL, JR.
                                   THOMAS N. O'NEILL, JR., J.